Good morning, Your Honors, and may it please the Court. My name is Cheryl Legree, and along with my co-counsel Brian Sutherland, we represent the plaintiff in this matter, Ms. Jackie Lewis. We're here today because the Court has asked us about a specific issue in the case, and that is, under Texas Department of Community Affairs v. Burdine and McDonnell-Douglas Court v. Green, what standard does the phrase, similarly situated, impose on the plaintiff, same or similar, nearly identical, or some other standard? We contend, Your Honor, that the nearly identical standard espoused by this Court in Nix v. WCYL in 1984 is wholly inconsistent with the Supreme Court cases on this issue and should be rejected. McDonnell-Douglas requires, it's a burden-shifting framework, and it's only one method by which the plaintiffs may prove cases of discrimination. And under McDonnell-Douglas, if the plaintiff is using comparators in order to make a prima facie case of discrimination, she must show that she's a member of a protected class, she was subject to an adverse employment action, she was qualified, and she was treated, the employer treated her similarly situated employees differently than it did her under similar circumstances. So can I ask you a quick question just about sort of the ordering? If you concede that those are the four steps under the prima facie analysis, how is it in your briefing that you say, let's take all of the comparison analysis and sort of demote it to step three? It sounds to me like that is the fourth factor in the prima facie case under McDonnell-Douglas and Burdine. Like sort of where would we get the authority to say, forget about it at step one, let's talk about it at step three? We're not contending that we should forget about it at step one. What we are saying and what the plaintiff is saying here and what the amicus brief also said is that at the prima facie case, the burden is not onerous, and the Supreme Court has said that repeatedly. The burden is not what, I'm sorry? Not onerous. What does that mean? What does that mean to say we're on summary judgment, not on a motion to dismiss? So discovery is complete, you've had access to their materials at this point, although you wouldn't have had it on the front end when you fashioned the complaint. What is it that you're required to put on the table in order to meet your prima facie obligation about the comparator? How much do you have to show? We would contend, Your Honor, that what we need to show is that there are comparators outside the protected class that were treated differently than our client under similar circumstances. So under McDonnell-Douglas, which was a case that involved some aspect of discipline, it was a rehire case, but the plaintiff in that case had been terminated and then applied for rehire, and the contention of the employer was that they were denied the position because they had engaged in some union activity. What the Supreme Court in McDonnell-Douglas said was he just needs to show at the pretext stage that there's some evidence of people who were treated differently for conduct that was comparably serious. And the Supreme Court has said, as recently as 2015 in Young v. UPS, that precise equivalence is not required. No, no, I accept that. I guess that's not really the thrust of my question. I'm going really back to the question that Judge Newsom asked you a moment ago. How much does the plaintiff have to put on the table on the front end with regard to the comparator at stage one, the prima facie stage? If they are relying on – if the plaintiff is relying on comparator evidence as the primary evidence to prove their case, then they do need to say, here is a white man in this case. My client is an African-American female. Here were two white men who were treated differently than my client under similar circumstances. So that's your test, similar circumstances? Similar circumstances. And what does that mean? Sort of flesh that out for us a little bit. I will. So what the Supreme Court said in McDonnell-Douglas is that the comparators must be comparable to the plaintiff. Okay. The misconduct must be comparable. And I understand there's not going to be a bright-line rule here. These cases are very fact-specific, which is why we end up here quite frequently, Your Honor. And there's really not much we can do about that. The lower courts weigh evidence all the time.  When was the conduct with regard to the comparators taken? I'm sorry, Your Honor? The comparators were subjected to administrative leave, a leave, automatic. Yes, Your Honor. When did that occur? It occurred, you mean, in relation to my client's termination? With respect to the termination of your client's position on July the 8th, 2010. Yes, Your Honor. When did the two comparators receive discharge? Officer McClure was placed on administrative leave the following year, in 2013. Wasn't it two and a half years afterwards? Yes, Your Honor, that's correct. Okay. So the two comparators were disciplined, as it were, under a fitness policy, which was enacted after your client was terminated. And you're comparing her termination, which was for not going to work, with something that happened to two other, two whites, two and one-half years later under a different policy. Your argument is that's similarly situated? It is, Your Honor, because what happened here was that our client was placed on administrative leave when her doctor said she could not be shocked by a treatment. Suppose this case had been filed and tried to summary judgment within the two and a half years, so you wouldn't have had the comparators. What would you do, seek a rehearing under Rule 60B or some such thing on the ground that you found some comparators? No, Your Honor. We would not have done that. But in this case, we did have comparators. We had comparators who were similarly situated to my client, in that all of them had physical issues, health issues, which precluded them from meeting the qualification standards of the position at the time that they were placed on administrative leave. So all three of them were considered unfit for duty at that time. Is that fair to say? Yes, Your Honor. And the physical fitness policy that was enacted in 2013, wasn't that an exercise of the chief's discretionary authorization under Chapter 6 that says that employees can be put on administrative leave for up to 180 days? Yes, Your Honor. And the testimony in the case was that the chief is entitled to lower the number of days, and that's what he did with the fitness policy that at least Union City has contended they enacted in 2013. We don't have a copy of that policy. So, just to make sure I'm understanding, when he had a single African-American woman in front of him, he gave her 21 days. But when no one was in front of him and he was making a generally applicable policy, he gave them 90 days. Yes, Your Honor. Is that enough for a prima facie case? Now, there may have been other reasons, but would that come up during pretext? Your Honor, it would come up during pretext, because my client was actually entitled to more leave under the city's policy than what Chief Odom eventually decided to do for people who couldn't meet the qualification standards for the job, which was a shorter amount of time. But here's the reality. My client was fired after 21 days. If she had been given the 90 days before Mr. Hurd ever got an attorney, if she had been given the 90 days that Mr. McClure was given, and if they had taken the opportunity to talk to her doctor — Were they measured against the same standard? That is to say, as I read the briefs, and I haven't looked at the record, what jumped out at me was there was a powerful disagreement about what policy governed. On the one hand, one party says the standard that governed giving the time to Hurd and McClure was this new policy, which was adopted substantially later, and the standard that governed Ms. Lewis was a completely different standard. On the other hand, I hear the plaintiff say, uh-uh, it was the same standard. How do I find the answer to that? The answer to that question is a little muddled, I'll be honest with you, Your Honor, and that's because the new policy has not been produced in this case. No, but you have the testimony of the officer who says this policy was new, here's when we adopted it, here's what it said, and we applied it to these two fellas. And that's uncontroverted in this record, right? That is uncontroverted, Your Honor, but we also have testimony of the city manager that says the police chief under the policies is permitted to make a more restrictive policy than that which the city has enacted. So the policy under which my client was disciplined or was placed on administrative leave actually entitled her to 180 days rather than the new restrictive policy that Chief Odom put in place for people who could not meet the physical qualifications of the job. You're not just on the Title VII side. You're just not trying to recover the days of administrative leave, but you're also challenging the termination decision, right? We are, Your Honor. So let me ask you this question, and maybe it's a way to try to get at what you think the standard actually means. For a couple of the comparators, there's at least an outside chance that with time they could become physically fit enough to pass the standard, right? Yes, Your Honor. But due to your client's unfortunate medical situation, I'm wondering whether there was any chance that she could have, even with the right amount of administrative leave, been able to be fit for her job because having undergone what she went through, her doctor certainly did not want her being tased as part of her training regimen. Does that add anything or take away anything from how close she and her comparators are? Well, Your Honor, I have a couple answers to your question, the first of which is Francisco Cedeno, which is another one of the comparators in this case, actually also had a heart condition, and his doctor initially said he can't be shocked by the taser because of that. He was never placed on leave. The city talked to his doctor, and his doctor said, you know what, I'm convinced that if you shock him in the leg instead of the back, it's not as much of a concern. That could have happened here if they had talked to my client's doctor. Where in the record does your client's doctor provide an affidavit that if they'd just given her more time or they'd shocked her in the leg instead of the trunk of the body, that everything would have been fine and she would have cleared her? I couldn't find that anywhere. That's not in the record because it wasn't asked at the deposition. Well, whether it was asked or not, there's no evidence that with more time she could have overcome the difficulty that led to her termination. There's no evidence otherwise either. They haven't produced any evidence that she wouldn't have been able to if they had discussed the accommodation. I thought the burden was on you. Am I wrong about that? We have the burden of— All right, and you didn't carry it in regard to the need for more time. Never suggested. The doctor said, don't do it. And never suggested, but wait a while and maybe you can do it. Your Honor, my client specifically asked in her request for accommodation, can I please come back to work while you talk to my doctor to try and find out a way that I can meet your standard? But that didn't suggest, and as I understand it, your doctor didn't just provide one letter. There was communications thereafter. Nobody ever suggested that with time she could be tased or with time the OC spray would be no problem. Actually, that's not true, Your Honor. On the day my client was fired, within three hours of her being terminated, her doctor told Chief Brown— Which they didn't know at the time they made the termination decision. They knew the same day she appealed her termination? Counsel, come on now. Answer the question. When the decision was made to terminate her, they did not know what the doctor told them three hours later, did they? That is correct. They hadn't taken the time to talk to the doctor. It's amazing they still don't know that because she's never said that. In the conversation with the doctor—you're correct on that, Your Honor— but in the conversation with the doctor, they never even asked the question. The notes are in the record of the conversation with the doctor. What they asked her doctor was, or what they said to her doctor was, how did you allow her to work here for the last 13 months and put us in danger?  See what you think about the Fernco case and whether that helps us get to a rule. Because that case says McDonald Douglas makes it clear that the prima facie burden is actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act. What information does that give us about how similar comparators need to be? Fernco really just extrapolated on McDonald Douglas. And the comparators, the conduct just needs to be of comparable seriousness. The difficulty with this case in resolving this issue is that it's not technically a misconduct case. All three of the comparators were placed on leave because they couldn't meet the fit-for-duty standards of the job at the time they were placed on leave. Was there any chance that Mr. Hurd was going to become fit-for-duty in the 449 days that he was on administrative leave? There's absolutely no evidence of that, and he ultimately did not because he was ultimately terminated. Well, wasn't it in fact he said he had a disability and he wanted to be able to do the job even with a disability? He was seeking accommodation not to be able to meet the fit-for-duty standards. So he was unfit for duty and had no chance of becoming fit-for-duty, but he got 449 days. Is that fair to say? That is fair to say. That is the evidence in the record, Your Honor. So can I ask you, I want to return to Judge Grant's question because I think I agree with her that Fernco may begin to point us the way to a standard. You know, it says that you've got to be able to infer from the prima facie evidence intentional discrimination. Yes, Your Honor. We've heard a thousand times that discrimination, the definition of discrimination is treating like things or people differently. Yes, Your Honor. So I would think the platonic form of discrimination is true apples to true apples. We recognize, of course, that in the real world there are no doppelgangers, as you say, right? Correct. So in an accommodation or a concession to the real world, we've throttled it back a little bit to say nearly identical. So why isn't that the appropriate standard? When what you have to do to prevail, even at Step 1, which as Judge Grant says, if the defendant says nothing at Step 2, Step 1 means you win. Yes, Your Honor. And so what you've got to do at Step 1 is to demonstrate a potential winner with respect to discrimination, the treatment of the different treatment of like individuals. Yes, Your Honor. Why not just take one step back from true like to nearly like, nearly identical, and call it a day? Why not? Well, there's a few reasons, the first of which is the courts below have applied the nearly identical standard as meaning doppelgangers, as meaning identical. Well, then that's their fault. We should correct them if that's right. Absolutely. Because nobody thinks that nearly identical and precisely identical are the same thing. That's ridiculous. Well, let me ask you a question. Do you know how many times since the nearly identical standard was announced in Nix in 1984, we, this Court, not the other courts, have applied it? Does 129 times sound right? I'm surprised it's that low, to be honest with you. And do you know of those 129 cases that are available on Westlaw where you've applied that standard, how many times the plaintiff has survived summary judgment? My guess would be maybe once or twice. Well, you're right, twice, so less than 2% of the time. But let me ask you, have you looked at all at the Seventh Circuit? I think you talked about the Coleman standard and Humphreys. Yes. So since 2007, do you know how many times the Seventh Circuit has applied their standard? I did not look at that, Your Honor. It's 121 times. And of those 121 times, 17 times the plaintiff has survived summary judgment, so 14% of the time. Do you think that's because there's less discrimination in Florida, Alabama, and Georgia than there is in Indiana, Illinois, and Wisconsin? Definitely, Your Honor. Or do you think there's something wrong with the standard? I think the standard is too onerous. The Supreme Court does not support, Supreme Court case law does not support a nearly identical standard. Let me tell you one thing that I want to give you an opportunity to answer because it sort of bothers me. And I know we're supposed to be focusing on the formulation of the standard, but under any standard, similar in all relevant respects, nearly identical, whatnot, you have two comparators who had problems with the physical fitness test. Sometimes it says in the briefs and the records, balance. Sometimes it says agility. And apparently they both had the same nature of problem. One of them recovered from it and passed the test. The other one didn't, which indicates that if you put some kind of effort in it, or maybe you didn't have as extreme, you could. But that's physical fitness, to run, balance, whatever. On the other hand, the plaintiff doesn't really have a physical fitness problem. So much as she has, she can't be at or near the discharge of certain preferred nonlethal weapons that may enable a law enforcement officer, if she's on the scene, to avoid using lethal weapons. But if the officer can't use spray or can't use the taser, and it's a matter of escalating violence, that fellow officer may have to use a firearm. Now, to me, that is not in any way similar to the situation of an officer who can't chase as well, or can't keep his balance as well, or can't stand on one foot, that sort of thing. I don't understand your argument that that's similar. Well, first of all, there's no evidence in the record that my client can't do her job because her doctor said she could be exposed to O.C. spray. And to be certified to carry a taser, she did not have to be shot. No, no, no, that certified is a total red herring. Just because the corporation says you don't have to be exposed to the shock doesn't mean that a law enforcement agency can't say, with every valid, reasonable justification for it, you've got to be exposed to it one time so you'll know what we're talking about. And so when you get in that kind of situation, and if you're accidentally exposed to it, you won't be in a state of being startled, never been in it before. And if you get on the witness stand and some lawyers cross-examine you in a civil case, well, you've never been exposed to it before. Yes, I have. We go through it in training. That's an entirely different thing than whether you can maintain your balance or agility. I don't understand, and you're not the only person who seems to just assume that that is similar, but not similar enough. I don't understand how that's similar at all. Your Honor, we contend, and you know this, that it is similar. My client could and would have been put on light duty as long as she could be exposed to O.C. spray. Wasn't there a letter from Dr. Harris at the front end saying, in words of substance, that she had several chronic conditions, including a heart condition, and that, quote, this was from the physician I'm talking about, quote, she would not recommend that a taser gun or O.C. spray be used on or near secondary to her chronic conditions. Yes, Your Honor. What does that mean? What would a police department probably take that to mean? Well, in this case, what they took it to mean is that she couldn't even be in the building with O.C. spray. The doctor didn't say that, and my client had not been required to carry O.C. spray in her entire career with Union City, nor up until 2010 when they instituted the taser policy had she been required to carry a taser. Let me ask the question at a slightly higher order of abstraction. Plaintiff has a chronic heart condition that makes it impossible for her to perform the duties of a firefighter. She can't carry someone weighing 200 pounds up or down a ladder. Comparator suffers from an abdominal hernia and can't do that either, but only for a fixed period of six months. Are they proper comparators or not? Regardless of whether we use the term nearly identical or similar in all material respects, hold aside the standard. In your view, is that a proper comparator to enable a jury to infer that the disparate treatment  I think it would depend, Your Honor. And what I mean by that is if you have a heart condition from which if you train and do physical therapy, then you could be clear to carry. No, no. I want you to accept for the purposes of my question. Heart condition comes on. Firefighter can no longer carry someone up or down a flight of stairs. Permanent problem. Occluded arteries. Cardiology says don't take the risk. Compare that with another firefighter who has a hernia and can't do it either, but he's limited to only six months. And if the recovery is proper, he'll be able to do that. Are those two folks similarly situated as comparators so that you could draw an inference of intentional discrimination from that? If there's no accommodation that can be given to the firefighter who will never be able to carry someone up and down stairs, then they're not similarly situated. Okay. Now, on the front end of the prima facie showing, would you not be obliged to point out that to the extent you're claiming there's a comparison between the two, that the first person couldn't perform that task at all, whereas the second person could after six months? Would that be something that you would be required to put on the table in order to meet your burden of making a prima facie showing on summary judgment, where you didn't have direct evidence of discrimination and you had to operate on a circumstantial theory? Assuming there is no other evidence from which you could infer discrimination. But that would be something you would have to tell the court. Correct. Are these the types of issues that a jury would be entitled to decide in the event that you're able to make it past summary judgment, counsel? Absolutely, Your Honor. Thank you. Weighing evidence is for juries. Thank you, counsel. We let you run over, but we'll give you a full ten minutes to reply if you need it. Ms. Glanton. May it please the Court. My name is Tracy Glanton, and I am with the law firm of Ellerby, Thompson, Sapp & Wilson. I'm appearing this morning on behalf of the city of Union City, Georgia, the defendant, Annapolis, in this case. The city's motion for summary judgment should be affirmed because Ms. Lewis has not created a genuine issue of material fact necessitating a trial in this case on any of her claims for race, sex, or disability discrimination. Ms. Lewis's discrimination claims are based on two discrete employment actions. The city's failure to provide her more than 21 days of administrative leave and the subsequent termination of her employment. Let me ask you a question. What is the purpose of the prima facie case under Bernard and McDonald? The purpose of the prima facie case is for the plaintiff to put enough evidence in the record that would permit a reasonable fact finder to determine that there was intentional discrimination with respect to the employment action at issue. Does it establish an element of the plaintiff's claim, or does it shift an evidentiary burden to the defendant, to your client? I'm not sure I understand your question. I think those are two different things. On one hand, if that prima facie case establishes an element of the case or establishes the case as a whole, then your client wins, can win no matter what. If it establishes merely a shift of the burden to the defendant, to your client, that means the plaintiff wins no matter what. If it instead shifts the burden to the defendant, doesn't that mean that then the defendant has to give a legitimate neutral reason for the employment action that they took? Yes. The prima facie case is only intended to create a presumption of discrimination, and that's a legally mandated, rebuttable presumption. So if the plaintiff can meet that standard, yes. The burden of production, not the burden of persuasion, shifts to the defendant to provide a legitimate nondiscriminatory reason for the action. And hasn't your client already done that? Yes, Your Honor. So why are we still arguing about whether they made out the prima facie case rather than whether the entirety of the evidence survives summary judgment? Because Ms. Lewis has not met her initial burden of proffering sufficient evidence that would permit a jury to find intentional discrimination with respect to the employment actions at issue here. In fact, if you actually look at the evidence in the record, Ms. Lewis makes an assertion that her comparators were placed on leave under the same policy. If you actually look at the evidence, this is in Plaintiff's Statement of Material Facts, her evidence is in paragraph 46 with respect to McClure and paragraph 47 with respect to Officer Hurd.  Counsel. Yes, Your Honor. Is it not so that when the complaint was filed, these two comparators didn't exist? Well, they existed, but not the... No, I mean the evidence regarding the two comparators. They were detectives in the police department. The complaint was filed in November 2012. Yes, Your Honor. All right. And at that time, and there was an EEO charge filed, was there not? Yes, there was, Your Honor. And the comparators were not mentioned, these two gentlemen, in that charge or in the complaint? Correct. Okay. After the complaint was filed and during discovery, they found that two and a half years after the termination of Plaintiff's employment, these two detectives had been placed on administrative leave because they couldn't pass physical tests. That is correct, Your Honor. All right. So the comparators arose during the litigation. That's correct, Your Honor. And in fact, we actually asked for Ms. Lewis to identify who her comparators were in paragraph 17 of our interrogatories to her. It's Exhibit 1 to her deposition. She didn't identify either McClure nor Hurd. But didn't she represent one of them? The Buckley firm, yes, represented Mr. Hurd. The law firm represented one of the two comparators. That is correct, Your Honor. So when was the new policy provided during discovery? The new policy was never provided. She never identified McClure nor Hurd, nor ever gave any indication that these were her comparators such that the fitness policy would have even been relevant when we were conducting discovery in this case. Can you go back and tell me what you were going to say earlier about those two paragraphs? Was it 46 and 47? Yes, Your Honor. In paragraph 46 of Plaintiff's Statement of Material Facts, she talks about Officer McClure, okay? At the time of his deposition, he'd been on leave for two days. And that was in April of 2014. This was almost four years after Ms. Lewis' termination. On page 33 and 34 of his deposition, he was actually shown the leave of absence policy that Ms. Lewis is relying on. And he was asked whether that was the policy that applied to him. And he said, quote, it's not. He testified that his leave was under the police department SOP, not the city handbook, which is where the leave of absence policy that she relies on is. And according to the SOP, he had 90 days to retake the fitness test and pass or he would be terminated. And this was confirmed by the chief himself that McClure was placed on administrative leave. There's no evidence that McClure was placed on administrative leave or that he was entitled to 180 days of leave. Well, the SOP policy that you're talking about was promulgated as an exercise of discretion under the city employee handbook, Chapter 6, Section 1, that the department director gets as a result of that chapter. Isn't that true? No, Your Honor. That's not in the record. Well, that seems to be what McCord and Rapson thought, because both of them testified that they believed that it was an exercise of the administrative leave policy. Actually, Ms. McCord testified when she was asked in her deposition what leave policy applied to her. And she was asked about the leave of absence policy. She said, I assume so. She didn't know. We objected to that. And Rapson, the city director? He is the director, Your Honor. The city manager. I'm sorry. He was the former city manager. Right. And he testified that it was an exercise of Chapter 6, Section 1, that discretionary authority, didn't he? I'll tell you. Not that I recall, Your Honor. Okay, well. Ms. Glanton, can I ask you to switch thoughts for a second? Is there a way for you to explain what you think the difference is between similarly situated and nearly identical? Or is it really just, eh, that's not enough? Oh, this is close enough. Isn't that where we are? Whether you call it similarly situated or whether you call it nearly identical, it's really hard on either side of the case to really put into words what that means, right? I think the nearly identical makes it a little bit easier for practitioners in the court. It makes it easier for defendants to win. Similarly situated makes it easier for plaintiffs to win because the standards seem to mean something on one side or the other. But it's hard to figure out what they really do mean, right? Well, Your Honor, I think the standard is similarly situated in all relevant respects. Is that different than nearly identical? Excuse me, Your Honor? Is similarly situated in all relevant respects different in kind or degree from nearly identical? I don't know that it is, Your Honor. What I can say is this. Well, really it doesn't matter what standard we come up with as long as we apply it in a uniform way. Well, the standard is important because it has to provide guidance to the litigants as to what evidence is relevant in discovery and to the ultimate question of whether or not the employment decision was based on intentional discrimination. I don't disagree with you, but if you or I or anybody else can't really explain in words what the difference between one standard and the other is, it really just comes down to how you apply any standard in a given way and how you do that from case to case, week to week, month to month, year to year, right? What is the difference between them in words? Let me say this, Your Honor. I looked at the 16 cases that Ms. Lewis has cited that this Court has decided over the last couple years, and it seems that the Court has come up with a way to provide some guidance to litigants and to the trial court about what that means. What does it mean? Okay. I'm going to quote from the panel decision in Diagnosis v. Target Media Partners because this is one of those cases that I think actually provides a pretty decent guidance for the litigants. To make a comparison of the plaintiff's treatment of employees outside the protected class, the plaintiff must show that he and the employees are similarly situated in all relevant respects. To determine whether employees are similarly situated, we evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. When making that determination, we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. Is that different than what the 1st, 2nd, 3rd, 4th, 5th, not 5th, 8th, 9th, and 10th circuits have said, which you have to be similarly situated in all relevant respects, all relevant or material respects, but not demanding quote-unquote exact correlation? Is there a difference between those, or are they the same? I don't know that there's that much of a difference. And the standard in this Court also doesn't require them to be exact either. So I think it's just a matter of semantics, whether or not you call it similar, comparable seriousness, nearly identical, as applied with the guidance that we've received from this Court. The parties can see in discovery what is relevant to the issue of determining whether or not there's intentional discrimination when you're talking about an employer's decision that is based on an employee's conduct. If it's just a matter of semantics, then how do you explain the difference in the rate of survival of summary judgment for a plaintiff in the 7th Circuit versus this Circuit? So, again, 7th Circuit is 14 percent, and here it's 1.6 percent. Your Honor, I don't know how to explain the difference. The 7th Circuit standard is a lot less onerous, isn't it? It's not a demanding standard to determine what similarly situated means. Our nearly identical is a much tougher burden for the Title VII plaintiff, isn't it? Well, Your Honor, the way that I read Coleman, I actually think they articulate sort of a more difficult standard because they talk about them being the same or exact without any differentiating or mitigating circumstances that might distinguish the conduct. That's not the way I read Coleman. I have it here in front of me. The similarly situated analysis calls for a, quote, flexible, common sense examination of all relevant factors. And doesn't it also say the fundamental issue remains whether such distinctions are so significant that they render the comparison effectively useless, which seems different from nearly identical? Well, the Coleman decision is interesting because, on the one hand, it does have more of a, what seems to me that would be a more onerous standard, and then they kind of come back and they talk about a lighter standard. So I'm not quite sure what the standard is there. Here's the difficulty I have with the 7th Circuit standard. If the standard is simply close enough so that the comparison is not useless or meaningless, how far departed are we from discrimination, which we've said is treating like things differently? It seems to me you're so far down the line at that point, if all you need is a not useless, not meaningless comparison, we're not really even in the apples-to-apples universe anymore. I agree, Your Honor. I'm trying to figure out what we do with all these Supreme Court cases that say that to establish a prima facie case is not an onerous or demanding burden. It's supposed to be easy for the Title VII plaintiff and not difficult for the Title VII plaintiff. Can you cite a case that says otherwise? I mean, all of the Supreme Court cases that I've read evaluating the standard for establishing a prima facie case, they all say that it's supposed to help the Title VII plaintiff and not hurt the Title VII plaintiff, make it easier to get past the establishment of a prima facie case. Am I reading these cases wrong? Well, Your Honor, the way that I read the language when they talk about it should not be onerous, the way I read that, it means it's not supposed to decide the ultimate question of fact, which is whether or not there's illegal discrimination. In fact, there are ways that a plaintiff can establish a prima facie case that are much weaker than other ways that a plaintiff can establish a prima facie case. I'm reading Texas v. Burdine, and I quote, the burden of establishing a prima facie case of disparate treatment is not onerous, close quote. And all of the cases say it's not a demanding or burdensome or inflexible approach. So when we say that similarly situated means nearly identical, that seems to me to run contrary to Supreme Court precedent. Am I reading these Supreme Court cases wrong? Your Honor, I read them differently. What I will say is that when the Supreme Court spoke most recently in Young, the Supreme Court actually said, even though they said, you know, that case can be distinguished from other Title VII cases because that really dealt with pregnancy accommodation. But nevertheless, it talked about the situation can't be meaningfully distinguished from the plaintiff. So there has to be enough similarities. Right, but isn't that, counsel, isn't that different from saying nearly identical? Is there a single Supreme Court case starting with McDonald and going through Young the entire period of time, and there are a whole bunch of them, where the Supreme Court has ever used the phrase nearly identical, whether you're talking about the prima facie showing or at the end of the game when you get to the pretext stage? Have they ever spoken of nearly identical? No, Your Honor. On summary judgment, the court has the full factual record before it, correct? Correct. And if this case were to go to trial, would the jury be questioned at the end about the comparators, the sufficiency of the comparators? No, Your Honor. What would the jury be questioned about? About whether or not the city's actions with respect to Ms. Lewis were taken because of her race or her sex. So in summary judgment, why are we tied up in knots over figuring out similar versus Seventh Circuit versus nearly identical when we, too, have the entire record and can look and see if there's sufficient evidence to show intentional discrimination? Because McDonald-Douglas was designed as a tool to help the courts. Does McDonald-Douglas say that it should be applied on summary judgment? Yes. It's a summary judgment tool, and it helps the court evaluate the evidence in a sensible, orderly fashion as it bears on the critical question of discrimination. Because we've said before in an unpublished case, at least, that on summary judgment you may not need to evaluate the comparators. Instead, you might go and see whether the evidence satisfies the ordinary summary judgment standard. I think that's what Atkins suggests, that once the defendant has met its burden, the discussion of the comparator burdens falls away and the court looks at the ultimate question. Why wouldn't we do that here? Because the Supreme Court has continuously applied the McDonald-Douglas standard and framework when evaluating motions for summary judgment. Has it ever done so in this precise context? I'm sorry, Your Honor? Has it done so in this context? In the discharge? Has it evaluated comparators on summary judgment before trial? Isn't the answer yes? Isn't the answer clearly yes? That's what they do in McDonald-Douglas itself. Yes, Your Honor. Under a standard that's a little bit different, those cases are hiring cases. But, yes, in McDonald-Douglas and in some of the other Supreme Court cases, they did find that under the standard articulated for establishing a prima facie case, in those cases that the plaintiff had satisfied that burden. One way to look at it is that if a case goes to trial and a jury renders a verdict one way or the other, and the case goes up on appeal by the losing party, at that point, the prima facie case of McDonald-Douglas drops out, and then you just have to find out whether or not there's enough evidence to have allowed the jury to reach the decision that it reached. But at the summary judgment stage, if the district court granted summary judgment on the ground that the plaintiff didn't meet her prima facie case, that has to be addressed on appeal, right? In other words, if the reason for the district court granting summary judgment is that a plaintiff didn't satisfy the McDonald-Douglas-Verdine prima facie case, that has to be addressed on appeal, right? Yes, because there would be the court would have found that there's no evidence that would permit a fact finder to find intentional discrimination. Right, but the McDonald-Douglas is one way of doing it. You also have the other so-called mosaic of evidence, which you put everything together, and although you may not technically satisfy the prima facie case, the mix and totality of circumstances allow a reasonable fact finder to conclude that there's been discrimination. You've got both of those avenues available, right? Yes, Your Honor. Can I get you to help me with the standard again? My hypothetical is that there are two employees. They have the same responsibilities at a job. One of them comes in an hour late routinely. That happens to be an African-American woman. The other one leaves an hour early every day or routinely. That happens to be a Caucasian man. Are those nearly identical? So if one was tardy routinely and one left early? Routinely. Routinely. An hour. Are those nearly identical? I don't know. I guess it would depend on if there's a particular reason that the employee has to be at work at a certain start time. I don't know. Are they similarly situated? Well, their situations are different, but they're both not at work for a period of time. Surely absent some reason to be at work at a particular time or to stay to a particular time, Judge Martin's hypothetical, surely they're nearly identical, right? Well, it seems like maybe you don't agree. I don't know. I don't know that there's any ‑‑ I'm trying to think of whether or not there's any distinguishing factors that might cause. Well, let's assume that that's her hypothetical. There's nothing else in the record. One walks in an hour late on the front end. The hours are 9 to 5. She walks in at 10. The other one walks out at 4 every day. One gets canned and the other does not. Whether I use nearly identical or similar in all relevant ways, that's good comparator, isn't it? If we're not looking at the amount of times that they came later or just one time, I would probably agree with that. Let's just assume that in that respect they were absolutely the same. Whether it's one time or 12 times, they're both the same. One comes in late. One leaves early. For all relevant purposes, are they not comparators, good comparators? I can't think of a reason that would distinguish them. Okay. Let me change it for you. Say there's a meeting that happens at 9 o'clock. The woman routinely misses the meeting, but there's no similar meeting at, you know, 4 o'clock when the man leaves early. Still similarly situated? I think there would be a little bit. I think they'd be different at that point. Certainly they're not nearly identical under your view of that standard, right? They're not nearly identical. Okay. Of course, the Seventh Circuit helps us out in Coleman v. Donahue. If we had their standard, they say there's no magic formula. A similarly situated inquiry should not devolve into a mechanical one-to-one mapping between employees. What's wrong with that standard? I don't think this court engages in a one-to-one mapping. I think the task of the trial court is to identify what those relevant factors are to the employer's decision. And then you can do the comparison once you figure out what those relevant factors are that go into the employer's treatment of those individuals. What if we looked at it this way? What if we just say that all that is required is an inference that absent discrimination, absent the race or sex differences between the plaintiff and the comparators, the differences in treatment would be arbitrary or irrational? If you don't mind, Your Honor, can you say that again? Yeah, absent. What we're looking for is an inference of discrimination from circumstantial evidence, right? Correct. So the inference is that absent the differences that could be viewed as impermissible discrimination, sex, race, the differences in treatment between the plaintiff and comparators would be irrational or arbitrary. Isn't that what we're looking for with the standard? Yes. No matter what we call it? Yes. Okay. Go ahead. Two police officers. One of them uses excessive, what we can all agree is excessive force with a taser. The other one uses excessive force with a nightstick. You know, one's a woman, one's a man. The woman gets discharged. Is that a nearly identical comparator? One uses excessive force with a taser. One with a nightstick. So they both engage in excessive force. So they engage in the same conduct even though the conduct's a little bit different, right? I probably would agree that they're probably proper comparators. Absent some distinguishing factor that might, but just that. Okay. So the person that uses a taser uses it against somebody who's mentally disabled. The person that uses the nightstick just uses it against somebody like one of us. Is that nearly identical? That's what you call a vote of confidence. I was trying to distinguish between the mentally disabled. I don't know that the officer at the time that they used either of those weapons would have known one way or another if one was mentally disabled and the other was not. I mean, the conduct is the same. But after the fact, there's huge publicity about the fact that there was a taser used against a mentally disabled person. Still, but no publicity. The one with the nightstick, that goes unnoticed. Are they still identical? For purposes of a prima facie case, I would say, I can't think of anything that would distinguish them at that stage. Now, the employer may come back with a reason about why they treated one differently than the other, and that would be a question of pretext. But at the prima facie stage, I can't think of anything that would distinguish that conduct. Nearly identical. I would think so. In your view at all. I would think so. Anything else? You were asked about irrational or arbitrary and whether you thought that was a fair explanation. If the explanation is irrational or arbitrary, then an inference of discrimination is allowed. Do you remember that? Yes? Yes. Okay. Do you think that's consistent with what the Supreme Court said in Burdine when it said, the prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on consideration of impermissible factors. In other words, if otherwise unexplained, in your view, the same thing as irrational or arbitrary. No. I'm sorry? No. Okay. Thank you. Couldn't it be, though, that they were irrational or arbitrary if not otherwise explained, that perhaps the defendant could come forward with some explanation. But if you, looking at the plaintiff's case, would say, absent more information, the differential in treatment is irrational or arbitrary, why wouldn't that be the right standard? I think you have to look at it as, would a reasonable employer make this distinction? Would a reasonable employer treat these people differently, whether it's different conduct, whether it's different policy, whether it's different standard? And you want judges to make this decision? Judges do make these decisions. Well, I know. But, I mean, you're throwing a lot of factual distinctions in there. I mean, why didn't that just go to a jury? Because the court, Your Honor, has to determine whether or not there's enough evidence to go to a jury. And it's the plaintiff's burden to come forth with a show by a preponderance of the evidence that there's intentional discrimination. And absent that, there's not a question for the jury. So the court does have to look at the evidence to determine whether or not a jury can find intentional discrimination. And that's what the court is doing. Does it have to show in the prima facie case that there's a preponderance of the evidence in support of intentional discrimination, or that from the facts it could be inferred that intentional discrimination took place? Those are two different standards. Correct, Your Honor. I agree with that. And there has to be sufficient evidence that would permit a jury to find intentional discrimination. I don't know that that's a preponderance. I know at trial the plaintiff's burden is to show with a preponderance of the evidence. So in summary judgment, what we're really trying to figure out from circumstantial evidence is whether there's a reasonable inference that impermissible discrimination explains the difference in treatment, right? Yes, Your Honor. It's not a question about once you have a case that can give rise to that kind of reasonable inference and you're instructing a jury, you're instructing them about a preponderance of the evidence standard where they have to determine that it's more likely than not that discrimination was at work, right? I mean, those are just two different things. Right? Yes. Thank you, Ms. Glenn. I just agree. I think we've gotten at least in part at what the heart of the matter here is. Something that I did not state in my opening, in my first 20 minutes, was McDonnell Douglas was decided before juries even decided these cases. And so a lot of what we're talking about here is comparing people based on facts and deciding whether they're the same or different, which is something that really and what's one of the things the Seventh Circuit said in Coleman. Juries should be deciding whether they're similar. So we should modify McDonnell Douglas in light of the fact that there are now jury trial rights? McDonnell Douglas, as it was pointed out, was a summary judgment case. Your Honor, I don't think we would need to modify McDonnell Douglas in order to do that. I think we would need to adhere to the heart of McDonnell Douglas, which is if a reasonable fact finder could conclude that there is an inference of discrimination, then the jury should be deciding this. If a reasonable fact finder could conclude that my client is similar to Walker Hurd, then that reasonable fact finder, the jury, should be deciding that issue and not the court. It's not a summary judgment issue, and I understand that these are difficult cases and difficult issues because we're dealing with discriminatory intent. But if a reasonable juror could conclude, for example, on Judge Martin's hypothetical where someone's an hour early and someone's an hour late or leaves an hour early, there are lower courts in this circuit that would say they're not similarly situated under the nearly identical standard because they actually do count. Well, this person was late five times and this person was late seven times, so they're not nearly identical summary judgment is granted. So is the solution to chuck the standard that courts have been applying for a long time, 129 times or whatever, and to start with something afresh or to kick everything to a jury or to tell courts you've been applying the standard wrong? Well, we would argue the standard is wrong under Supreme Court precedent. But even if this Court finds that the nearly identical standard can comport with Supreme Court precedent that says it only needs to be of comparable seriousness and does not need to be precisely equivalent, we would hope that this Court would provide instruction to the lower courts so that they would. Well, that's why we're here, aren't we, to determine whether the nearly identical standard is too tough, isn't that why we're here for en banc? That's my understanding of why we're here. That's the way I read the en banc question. And I believe that it doesn't comport with Supreme Court precedent, period. And so if we were to decide that nearly identical is just too tough, what should the standard be? Could we say that the proposed comparator has to have an objective, there has to be an objectively identifiable basis for comparability, something similar to what the Seventh Circuit has? That's what I argued in my briefs because I believe that it's true, Your Honor. I think that that is more consistent with Supreme Court standard, that as long as they have enough in common for them to be considered equivalent by a reasonable juror, then the jury should be deciding that. Yes. In order to get past summary judgment and get your case to a jury. Yes, Judge Wilson. If a jury could say you're five minutes late and you're ten minutes late and we think that's really the same or similar, then it should be surviving summary judgment and going to the jury to decide that. Is there a difference in your view between the standard of nearly identical on the one hand and similar in all relevant respects on the other? Do those standards really differ? And if they do, tell me how. They do differ, Your Honor, from my perspective and from the plaintiff's perspective because nearly identical sounds a lot like precise equivalence. It really does. That's not the question. The question is whether similar in all relevant respects or different. I'm sorry. I must have misunderstood the question. No. I thought we were talking about it. Maybe I misunderstood it. No, no. He's got it right. He's got it right. So similarly situated in all relevant respects. All relevant ways. Is there any difference between me saying the standard is similar in all relevant ways or saying the standard is the comparatives must be nearly identical? Yes, Your Honor. It is different. Tell me what the linguistic difference is. The tonality is different. When I use the word identical, it sort of moves me into another range. But when I modify it with nearly, I'm not sure I know. It's sort of close, but it doesn't have to be identical. Is there a difference between sort of close but not identical and similar in all relevant ways? Your Honor, I believe they are different standards. And I understand what you're saying. I'm just asking. That nearly modifies it. I do understand that. And perhaps it is, as Judge Newsom said, the way it's applied. And we need to give direction and say we don't mean identical. We don't mean the same kind of thing. Let me ask you the second question then. If we were to eliminate the standard of nearly identical and impose the standard of similar in all relevant ways, would you have a quarrel with that standard? No, Your Honor. Thank you. And that would mean that if there was a relevant or material way in which they weren't similar, some re-judgment goes to the defendant. If a reasonable juror could not conclude. No, no, no, no. If they're not similar in all relevant ways, if there's a relevant way in which they are different, would you say some re-judgment for the defendant? That's a difficult question. Honestly, you'd have to say. Wouldn't we let the district court decide that if we decided that nearly identical was too difficult? That was the wrong standard. Wouldn't we send it back and let the district court decide whether or not the plaintiff meets the elements of a prima facie case under a newly created Eleventh Circuit standard? In this particular case, Your Honor? Uh-huh. The panel opinion applied the similarly situated standard and found that. We know that, but you're back in the district court if Judge Wilson wants to take us there. And they are similar in all but one relevant respect. Does the defendant get summary judgment? Similar in all but one relevant respect appears to be nearly identical and it doesn't comport with the Supreme Court. Two relevant respects. But that's the problem with the standard. We don't have a standard. Shouldn't we just have the district court decide whether he thinks the jury could go one way or the other? We just throw out the standards? Well, there is a standard. The Supreme Court standard is, was the conduct of comparable seriousness if you're talking about a misconduct case? We're not. We're talking about this case right now. In this case. Because it's a non-misconduct case. All right. So I'm asking you, you're the one pushing the standard as I understand it. How many relevant ways does it have to be different before there are non-comparators? I can't answer that question for you, Your Honor, because it's a counting standard and that's precisely why Coleman is a more, is a standard we're contending that this court should adopt. Can I ask you a quick question, just to step back a couple of steps? One of the issues that was pretty prominently and boldly briefed was that the comparison analysis should be just stripped out of Step 1 and demoted into the pretext standard. But I haven't heard you arguing that today. Are you sort of largely walking away from that? We've been talking about Step 1 now for an hour. Your Honor, I think to really answer that question, this court's opinion in vessels is really the opinion to look at. I just want to know your position. Do you still believe that any comparative analysis should be taken out of Step 1 and put into Step 3? We believe that the comparative analysis of the differences, the distinctions as raised by the defendant, should be analyzed at the pretext stage. But does the plaintiff have a burden, even if only to shift it, to get to the presumption, the potential winner at Step 1, to show some comparison? Some comparison, yes. Okay, so it's not that comparison has been totally demoted into Step 3. It's that you have some sort of weak beer standard at Step 1 and a stronger beer standard at Step 3. Yes. Got it, okay. Let me ask you something. Getting back to the question  similar in all relevant respects or ways, wouldn't it be the case that if that were the standard, then the district judge would be looking to determine whether a reasonable jury could decide whether they were similar in all relevant ways? And only if a reasonable jury could not decide that they were relevant in all... that they were similar in all relevant ways, then would summary judgment be appropriate. Is that your position? Yes, Your Honor. Okay. We believe this is a jury question in most cases. Thank you, Your Honor. Thank you, Ms. LaGrie. Y'all look like you could use a break. We're going to take 15 minutes. All rise.